❏ Original

CLERK'S OFFICE
A TRUE COPY
Apr 18, 2022
s/ Michael Longley
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Records and information associated with the cellular devices assigned call number call number (414) 587-6004, whose listed subscribers are unknown, that is in the custody or control of US Cellular, as further described in Attachment A. | ) ) ) ) |

Case No. **22-M-418 (SCD)**

Matter No. 2022R00039

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____

*(identify the person or describe the property to be searched and give its location)*:

See Attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before      5-2-22 _____ *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Stephen C. Dries _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:      4-18-22.  4:25 pm _____

*Judge's signature*

City and state:   Milwaukee, Wisconsin _____      Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**
**Matter No. 2022R00039**

1. Records and information associated with the cellular devices assigned call number call number **(414) 587-6004**,  (referred to herein and in Attachment B as "the **TARGET CELL PHONE**") whose listed subscribers are unknown, that is in the custody or control of US Cellular (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 8410 W Bryn Mawr Ave, Chicago, IL 60631.

2. **TARGET CELL PHONE**.

**ATTACHMENT B**
**Particular Things to be Seized**
**Matter No. 2022R00039**

I.     **Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

   a.  The following subscriber and historical information about the customers or subscribers associated with **TARGET CELL PHONE** for the time period from April 14, 2022 to present:

      i.  Names (including subscriber names, user names, and screen names);

      ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

      iii.  Local and long-distance telephone connection records;

      iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

      v.  Length of service (including start date) and types of service utilized;

      vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

      vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

      viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **TARGET CELL PHONE** including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **TARGET CELL PHONE** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **TARGET CELL PHONE** will connect at the beginning and end of each communication.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **TARGET CELL PHONE**.

c. Information about the location of the **TARGET CELL PHONE** for a period of 30 days, during all times of day and night. "Information about the location of TCP-1" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The

government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

### III.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1) involving James A. DAVIS, LaJuan J. GRAHAM, Juiquin PINKARD and other known and unknown individuals since August 1, 2021.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.



CLERK'S OFFICE
A TRUE COPY
Apr 18, 2022
s/ Michael Longley
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Records and information associated with the cellular devices assigned call number call number (414) 587-6004, whose listed subscribers are unknown, that is in the custody or control of US Cellular, as further described in Attachment A.

)
)
)
)
)
)
)

Case No. **22-M-418 (SCD)**

Matter No. 2022R00039

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Distribution and possession with intent to distribute controlled substances and conspiracy to distribute and possess with the intent to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*ANdrew Matson*

*Applicant's signature*

DEA TFO Andrew Matson

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means).*

Date: **4-18-22** _____

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT
# MATTER NO. 2022R00039

I, Andrew Matson, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephones assigned call number **(414) 587-6004** (the "**TARGET CELL PHONE**"), subscribers unknown.  The service provider for the **TARGET CELL PHONE** is US Cellular ("Service Provider"), a wireless telephone service provider headquartered at 8410 W Bryn Mawr Ave, Chicago, IL 60631. The **TARGET CELL PHONE** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3.      Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing,

2

routing, addressing, and signaling information associated with each communication to or from the **TARGET CELL PHONE**.

4.      I am a Task Force Officer with the Drug Enforcement Administration, (DEA) and have been since February 2021.  Before that, I was employed as a police officer with the Racine Police Department in Racine (RAPD), Wisconsin, where I spent the last 4 years as a Detective in the Special Investigations Unit (SIU) assigned to the Drug Enforcement. During my tenure as a police officer, I have been involved primarily in the investigation of large-scale drug traffickers operating not only in the City of Racine and the State of Wisconsin, but also throughout the southeastern Wisconsin.  As a member of the DEA I have worked investigations directly in the City of Milwaukee and the State of Wisconsin as well as the entire United States based upon the direction of investigations that arise through the Milwaukee District Office of the DEA.

5.      As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, United States currency, and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I

have attended training courses, which specialized in the investigation of drug trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

6.    Based upon my training and experience, as well as information relayed to me during the course of my official duties, I know that a significant percentage of controlled substances, specifically marijuana, cocaine, heroin, and methamphetamine, imported into the United States comes from Mexico and enters the domestic market at various points along the southwest border of the United States, because Mexican cartels control the transportation, sale, and importation of cocaine, marijuana, heroin, and methamphetamine into the United States.

9.    Based on my training, experience, and conversations with other law enforcement officers, I know that distributors of marijuana, methamphetamine, cocaine, heroin, as well as other controlled substances, often used cellular and landline telephones.  Additionally, I know that drug traffickers often change their phone numbers and cellular devices on a frequent basis in an attempt to thwart law enforcement from tracking their phones and to conceal their identities. I know that these individuals often use code words to discuss controlled substances and methods of concealing controlled substances while talking on the telephone. I know that drug traffickers often conduct extensive counter-surveillance to avoid law enforcement detection.

10.    Based upon training and experience, I know that narcotics-trafficking and money-laundering organizations routinely used several operational techniques to sustain their illegal enterprises. These practices are designed and implemented to achieve two paramount goals: (1) the successful facilitation of the organization's illegal activities, including the importation and

distribution of controlled substances, and the subsequent repatriation of the proceeds of that illegal activity; and (2) the minimization of the exposure of coconspirators, particularly those operating in leadership roles, from investigation and prosecution by law enforcement. More specifically, based on my training and experience, I know the following:

a. Sophisticated drug-trafficking organizations routinely compartmentalize their illegal operations. The compartmentalization of operations reduces the amount of knowledge possessed by each member of the organization. This method of operation effectively minimizes the potential damage an individual cooperating with law enforcement could inflict on the organization and further reduces the adverse impact of a particular law enforcement action against the organization.

b. Members of these organizations routinely used communications facilities, such as cellular telephones, to communicate directions and information about the organization's illegal activities to other organization members.

c. During the course of these telephonic communications, organization members routinely use coded references and encryption in an effort to elude law enforcement detection.

d. The communication of time sensitive information is critical to the successful conduct of these organizations' illegal activities. The critical nature of this information stems from the necessity of the organization's leadership to provide direction for the importation and distribution of narcotics, and the subsequent laundering of the proceeds of those illegal activities.

e. Drug traffickers and the money launderers associated with them often confine their illegal telephonic communications to long-trusted organizational members and other high-level narcotics traffickers in an attempt to evade law enforcement and circumvent narcotics investigations; and

f. Drug traffickers routinely use fictitious names or other individuals to register pagers, telephones, vehicles, real property, and utility services to avoid detection by law enforcement.

11. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence

has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

12. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

13. Based on the facts set forth in this affidavit, there is probable cause that the possible crimes of distribution and possession with intent to distribute controlled substances and conspiracy to distribute and possess with the intent to distribute controlled substances, violation of 21 U.S.C. §§ 841(a)(1) and 846, have been committed by James A. DAVIS, DOB: XX/XX/1983, LaJuan J. GRAHAM, DOB: XX/XX/1983, Juiquin PINKARD, DOB: XX/XX/1984 and other known and unknown persons, collectively identified to the Drug Trafficking Organization (DTO). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## II. JURISDICTION

14. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. §

2711(3)(A)(i).

### III.    PROBABLE CAUSE

#### A.  Background into DAVIS' DTO

15.    The United States, including, DEA, is conducting a criminal investigation into

James A. DAVIS, LaJuan J. GRAHAM, Juiquin PINKARD and other unidentified subjects for

possible violations of 21 U.S.C. §§ 841(a)(1) and 846.

16.    In December 2021, I was contacted by Detective David Rybarik of the Racine

Police Department.  Detective Rybarik is assigned to the Special Investigations Unit – Gang

Enforcement.  Detective Rybarik stated he received information from a confidential source (CS)

indicating that since at least August 2021 James A. DAVIS, DOB: XX/XX/1983, was trafficking

controlled substances, specifically heroin in southeastern Wisconsin, more specifically in

Milwaukee County and Racine County in the State of Wisconsin.

17.    Detective Rybarik stated CS provided information related to James A. DAVIS.  CS

stated DAVIS lives in Milwaukee, Wisconsin.  CS stated they could purchase large amounts of

heroin directly from DAVIS.  CS did not know specifically where DAVIS resides in Milwaukee,

Wisconsin.  CS stated DAVIS drives a white colored Audi Q7.  Further CS stated often DAVIS

will conduct his illegal drug transactions with the use of rental vehicles.

18.    CS information is credible and reliable because CS is providing information based

on CS personal knowledge and observations and said information has been corroborated by other

sources during this investigation and supported by surveillance and call detail records.  CS is

cooperating for consideration on several Bail Jumping, Operating While Intoxicated (OWI) and

Operating While Revoked (OAR) offenses. CS has a felony conviction for Manufacturing / Deliver

Heroin and multiple misdemeanor convictions for Resisting / Obstructing an Officer, OWI and shoplifting.

**B. Controlled Drug Buys from DAVIS' DTO.**

19.     Generally, during the below listed controlled purchases of controlled substances, the CS and/or undercover agent (UC) placed a recorded phone call or text messages to the target, captured audio and video of the controlled purchase, was followed to and from the controlled purchase location and the above evidence and statements reviewed and verified by law enforcement. Further, prior to the controlled purchase and following the controlled purchases, case agents searched CS and CS's vehicle and no drugs, money, or weapons were located by case agents. Additionally, the controlled substances were all weighed and tested positive for the listed substance using Nark II test kits following the printed instructions and the targets were identified by CS and/or the UC through driver's license photographs.

**a.  January 12, 2022 – Controlled Purchase with DAVIS - (262) 888-0716**

20.     Based on CS indicating they could purchase heroin from DAVIS, members of DEA and members from Racine Police Department – SIU conducted a controlled purchase of 25 grams of heroin from DAVIS.

21.     The controlled purchased took place on January 14, 2022. During the operation CS made contact with DAVIS at phone number (262) 888-0716 to coordinate the controlled purchase of 25 grams of heroin for $1750. The location of the buy was initial scheduled to occur in Racine, Wisconsin. DAVIS sent CS a text message from (262) 888-0716 requesting CS travel to 2030 N. 31 Street, Milwaukee, WI 53208 to pick up the heroin.

22.     Once at 2030 N. 31st Street, Milwaukee, WI 53208, CS made physical contact with DAVIS inside CS's vehicle. DAVIS informed CS "his guy" was on his way with the heroin. After several minutes a vehicle arrived. DAVIS approached and entered the vehicle. After a short period

of time DAVIS exited the unidentified vehicle and returned to CS's vehicle with the heroin. DAVIS gave CS the heroin and CS gave DAVIS the $1750 of buy money. DAVIS exited CS's vehicle and left the area and turned over the suspected heroin to the assisting case agent.

23.    The suspected heroin was transported to the Milwaukee District Office for processing. The controlled substance had a pre and post weight of 25.8 grams. The substance was tested using NARK II test kit for heroin and fentanyl. The NARK II test for heroin was negative. The NARK II test for fentanyl showed a positive presence for the substance. The controlled substance / fentanyl was packaged and placed into evidence.

24.    During the week after the controlled purchase of fentanyl, DAVIS and CS had text conversations. DAVIS was under the impression that CS was purchasing the heroin for a friend. Based on DAVIS impression DAVIS told CS he could introduce "his guy" to CS's friend so they could deal directly. Due to the information a second controlled buy was scheduled in which case agents were able to introduce UC.

**b. January 12, 2022 – Controlled Purchase with DAVIS and GRAHAM and Counter Surveillance with PINKARD – (262) 888-0716**

25.    The second controlled buy was scheduled for January 26, 2022. CS made contact with DAVIS at (262) 888-0716. DAVIS agreed to travel to Racine, Wisconsin for the controlled buy. Prior to the controlled buy CS set up a location in Racine, WI. DAVIS agreed to bring his supplier to the deal. The deal was set for the purchase of 50 grams of heroin for $3500. CS traveled with UC in an undercover police vehicle to conduct the deal.

26.    Upon UC and CS arriving at the meet location in Racine, WI, DAVIS and his supplier entered UC's vehicle. The supplier was identified as LaJuan J. GRAHAM by using a driver's license photo from Wisconsin DOT. While in UC's vehicle CS introduced UC to DAVIS and DAVIS introduced GRAHAM as "LG". While in the vehicle GRAHAM passed a bag to UC

containing the suspected heroin.  After UC inspected the suspected heroin UC passed $3500 in buy money directly to GRAHAM.  GRAHAM and UC has a short conversation in which they exchanged cellular phone numbers.  GRAHAM provided UC his phone number, which I believed was (414) 840-9739 based review of my notes; however, it was later determined GRAHAM provided number (414) 840-9759 to the UC.  UC maintained custody of the suspected heroin.

27.    The suspected heroin was transported to the Milwaukee District Office for processing.  The controlled substance had a pre and post weight of 50 grams.  The substance was tested using NARK II test kit for heroin and fentanyl.  The NARK II test for heroin was negative. The NARK II test for fentanyl showed a positive presence for the substance.  The controlled substance / fentanyl was packaged and placed into evidence.

28.    During the course of the controlled buys assisting agents attempt to assist with conducting post surveillance of DAVIS and GRAHAM as they left the meeting spot together in a black Ford Fusion with Florida license plate 88ABGR.  During the post surveillance the vehicle was lost.  The registration on the vehicle used by DAVIS and GRAHAM on January 26, 2022 listed to Avis / Budget rental company. Records from Avis /Budget indicated GRAHAM rented the Ford Fusion on January 24, 2022.

29.    Also, during this undercover controlled buy on January 26, 2022, case agents conducted surveillance in the parking lot where the buy occurred.  Case agents observed a silver Honda with Illinois registration CU 21390 circling the parking lot.  Once the undercover controlled buy was completed, the Honda followed DAVIS and GRAHAM from the location.  An unidentified black male was operating the silver Honda.  Case agents later identified this black male as the same black male, Juiquin PINKARD DOB: XX/XX/1984, that provided UC with fentanyl in the February 10, 2022 undercover controlled drug buy, described below.  Based on my

training and experience, the Honda appeared to be conducting counter-surveillance for DAVIS and GRAHAM.

30.     Case agents reviewed records that on January 28, 2022, DAVIS was stopped by Caledonia Police Department in the same silver Honda with Illinois registration CU 21390, which PINKARD was driving on January 26, 2022.  Caledonia Police Officers also located a white powder substance which later tested positive for cocaine inside the silver Honda.

### c.     February 10, 2022 – Controlled Purchase with PINKARD and GRAHAM– (414) 840-9759

31.     On February 10, 2022, case agents conducted an undercover controlled buy for 50 grams of heroin between UC and GRAHAM.  UC verified GRAHAM's number by contacting GRAHAM at (414) 840-9759 via text and phone calls to coordinate the drug purchase. UC went to a Citgo gas station located at 3929 North 49th Street Milwaukee, WI to conduct the undercover controlled.  While UC waited, GRAHAM call UC using telephone number (414) 840-9759. GRAHAM stated that "his guy" was in the area in a silver Volkswagen.  UC observed a Volkswagen with Ohio registration HST 7153.  Once the UC approached the Volkswagen PINKARD, who was later identified by his DOT driver's license photo, exited the Volkswagen and entered UC's vehicle.  PINKARD told UC he/she would be dealing with PINKARD in Milwaukee but "other dude down there". Based on the previous undercover controlled buy from January 26, 2022, case agents and UC believed PINKARD was referring to either DAVIS and/or GRAHAM if deal took place in Racine. While in the vehicle PINKARD passed a bag to UC containing the suspected heroin.  After UC inspected the suspected heroin UC passed $3500 in buy money to PINKARD.  After the completion of the undercover controlled buy UC returned to the predetermined meet location and provided the suspected heroin to case agents.

32.     The suspected heroin was transported to the Milwaukee District Office for processing.  The controlled substance had a pre and post weight of 49.9 grams.  The substance was tested using NARK II test kit for heroin and fentanyl.  The NARK II test for heroin was negative.  The NARK II test for fentanyl showed a positive presence for the substance.  The controlled substance / fentanyl was packaged and placed into evidence.

33.     Following the undercover controlled buy from February 10, 2022, case agents utilized a database to determine the registered owner of the Volkswagen with Ohio registration HST 7153.  Case agents learned the Ohio registration HST 7153 was listed to Enterprise rental company, but to a Ford vehicle not a Volkswagen.  Based on my training and experience, I know that drug traffickers will switch license plates in an attempt to thwart law enforcement from tracking vehicles back to themselves in order to conceal their identities.

### d.  February 24, 2022 – Controlled Purchase with PINKARD – (414) 840-9759 and Identification of (414) 587-6004 (TARGET CELL PHONE)

34.     On February 24, 2022 UC arranged for an undercover controlled buy for 100 grams of heroin for $6500 at 4001 N. 60th Street Milwaukee, WI.  UC exchanged text messages with the DTO's customer drug phone (414) 840-9759 to arrange this controlled buy.  During the controlled buy PINKARD arrived in a silver Volkswagen Passat (VW) with Ohio registration HST7153, the same vehicle used during the controlled buy on February 10, 2022.  During the controlled buy PINKARD exited the VW and entered UC's vehicle.  PINKARD provided the UC 100 grams of suspected heroin in exchange for $6500.  PINKARD then exited UC's vehicle, returned to the VW and left the area.  Case agents attempted to conduct a follow of the VW with negative results.  The controlled buy was captured on audio/video recording.

35.     The suspected heroin was transported to the Milwaukee District Office for processing.  The controlled substance had a pre and post weight of 100 grams.  The substance was

tested using NARK II test kit for heroin and fentanyl. The NARK II test for heroin was negative. The NARK II test for fentanyl showed a positive presence for the substance. The controlled substance / fentanyl was packaged and placed into evidence.

36.     Following the controlled buy on February 24, 2022, PINKARD called UC from (414) 840-9759. PINKARD told UC once he is more comfortable with UC their meeting location will be safer. Also, during the conversation PINKARD said his "man" told him to deal with UC. PINKARD asked UC about the potency of the "dope" and PINKARD stated he controls the potency and wants it to be correct, so people do not die. Further PINKARD told UC if he wants strong "dope" he can provide it but the dope cost a little more.

37.     On March 1, 2022 a member of the DAVIS' DTO using the customer drug phone (414) 840-9759 text messaged the UC and stated the customer drug phone number of (414) 840-9759 was being disconnected and a new phone number of **(414) 587-6004 (TARGET CELL PHONE)** would be activated to coordinate future dealings. Case agents used law enforcement data base which indicated **(414) 587-6004 (TARGET CELL PHONE)** service provide is US Cellular and no subscriber information was listed, the same as the DTO's previous customer drug phone.

38.     As of March 1, 2022, electronic surveillance of the DTO's previously drug customer number (414) 840-9759 only shows incoming calls with nothing outgoing. Based on the investigation into DAVIS' DTO, case agents believe (414) 840-9759 is no longer being used.

39.     On March 7, 2022, UC text messaged DAVIS' DTO's new drug customer number, **(414) 587-6004 (TARGET CELL PHONE)** to arrange a controlled drug buy. UC received a call from **(414) 587-6004 (TARGET CELL PHONE)**. UC spoke to the caller, who UC believed was either GRAHAM or PINKARD based on prior interactions.

**e. March 24, 2022 - Controlled Purchase with PINKARD and DOUGHTY– (414) 587-6004**

40.　　On March 24, 2022 case agents conducted an undercover controlled buy of 100 grams of heroin from the Davis' DTO. UC made contact with drug customer phone **(414) 587-6004 (TARGET CELL PHONE)** via text message in an attempt to order 100 grams of heroin. Through several text messages and several phone calls discussing a possible meet location, PINKARD finally agreed to meet the UC in Racine, WI to conduct the transaction of 100 grams of heroin for $6500. The UC believed they were speaking with PINKARD based on prior contacts with **(414) 587-6004 (TARGET CELL PHONE)** and PINKARD.

41.　　PINKARD contacted the UC to inform the UC he was at the predetermined location in Racine, WI. Pinkard told the UC to make contact with a black Audi A4. PINKARD stated the female in the vehicle has the heroin. The UC located the vehicle and made contact. The female was identified as Brook DOUGHTY by the UC through a Wisconsin driver's license photo. DOUGHTY passed the UC a cardboard / paper cup which had the suspected heroin inside. The UC gave Doughty $6500.00 of DEA funds.

42.　　The UC returned to the predetermined meet location with the cardboard / paper cup containing the suspected heroin. The substance was taken to the DEA Milwaukee District Office where it was weighted and tested. The substance had a gross weight of 101.5 grams with packaging. The substance was field tested and showed a positive presence for heroin and fentanyl.

43.　　Prior to the undercover controlled buy, case agents conducting surveillance observed the Black Audi A4 at the predetermined met location. Case agents also observed a silver Ford Taurus with extremely heavy tinted windows to which you could not see inside of the vehicle. Further the Ford did not display any vehicle registration. Case agents observed the Ford follow

the Audi A4 to the predetermined location. Upon review of court authorized electronic surveillance, Pinkard's cellphone (414) 748-5568, which was previous identified by case agents as described in subsection C, and the DTO's drug customer phone **(414) 587-6004 (TARGET CELL PHONE)** both showed to be in the area of the controlled buy. Based on prior controlled buys by Davis' DTO has used countersurveillance for the controlled buys, and case agents believed PINKARD was conducting that surveillance for DOUGHTY.

44. After completion of the controlled buy, the Audi A4 operated by DOUGHTY left the area and returned to Milwaukee in the area in which she lives. The Ford did not immediately exit the lot as it waited to see if DOUGHTY or the UC were being followed. After several minutes the Ford let the area and phone court authorized electronic surveillance for Pinkard's cellphone (414) 748-55-68 and the DTO's drug customer phone **(414) 587-6004 (TARGET CELL PHONE)** were shown to be traveling back to Milwaukee and going to toward the area of DOUGHTY'S residence. Case agents were unable to maintain direct physical surveillance of DOUGHTY and PINKARD due to failed radio communication.

45. Case agents reviewed call detail records of DAVIS' DTO drug customer phone **(414) 587-6004 (TARGET CELL PHONE)** during the arraignments of the undercover drug transaction. While the UC was attempting to set up the drug transaction, PINKARD initially indicated "his guy" would not be able to come to Racine, WI until later in the day, but later PINKARD indicated he would be able to complete this drug transaction sooner. These appeared to be consistent with communication between **(414) 587-6004 (TARGET CELL PHONE)** and both DAVIS and GRAHAM during this same time frame. Following the call by the UC, **(414) 587-6004 (TARGET CELL PHONE)** contacted DAVIS's cell phone number (262) 888-3327, which was previous identified by case agents as described in subsection C, several times via phone call . After talking to DAVIS, **(414) 587-6004 (TARGET CELL PHONE)** called GRAHAM at

(414) 345-7827, which was previous identified by case agents as described in subsection C. During the timeframe of the coordinating and executing the controlled buy **(414) 587-6004 (TARGET CELL PHONE)** made six contacts to DAVIS and six contacts to GRAHAM.

46.     During the communication between the UC and PINKARD, **(414) 587-6004 (TARGET CELL PHONE)** case agents monitored the call detail record and court authorized electronic surveillance of **(414) 587-6004 (TARGET CELL PHONE** and PINKARD'S phone (414)748-5568.  The electronic surveillance showed both phones were in the same general area. During the travel just prior to the controlled buy, PINKARD used his cellphone (414) 748-5568 to contact (414) 719-1574.  Case used a law enforcement databased that indicated (414) 719-1574 was a telephone number associated with DOUGHTY.  Court authorized electronic surveillance showed that at this time PINKARD'S phone (414) 748-5568 and DAVIS' DTO drug customer phone **(414) 587-6004 (TARGET CELL PHONE)** were in the area of DOUGHTY'S residence, 2720 E. Edgerton Ave., Cudahy, WI, which was also connected to DOUGHTY on a law enforcement database.

**C.  Identification of GRAHAM'S number (414) 345-7827, DAVIS' number (262) 888-3327, and PINKARD'S number (414) 748-5568**

47.     Based on my training and experience regarding DTOs, I am aware that drug traffickers usually maintain a drug customer line for arranging drug transaction, but then will generally use other telephones to contact members of the DTO in order to evade law enforcement. Further, based on my training and experience regarding DTOs, members of a DTO may pass the drug customer phone among co-conspirators and maintaining separate telephone number for communicating among themselves, again in order to evade law enforcement.  These types of tactics make it important to identify possible other cell phone numbers for members of DAVIS' DTO, which case agents were able to determine as outlined below.  It is important to note, that based on

the identifications of DAVIS' DTO member's cell phone numbers, it does appear DAVIS' DTO is using multiple phones for communication and also passing the drug customer line among its members. For example, on February 10, 2022 UC coordinated the purchase of 50 grams of fentanyl from GRAHAM on the prior drug customer phone (414) 840-9759. On February 24, 2022 UC coordinated the purchased of 100 grams of fentanyl from PINKARD at the prior drug customer phone number of (414) 840-9759. Further on March 24, 2022 PINKARD used his number of (414) 748-5568 to communicate with DOUGHTY and also used the drug customer line **(414) 587-6004 (TARGET CELL PHONE)** to communicate with GRAHAM and DAVIS.

### a. GRAHAM's Number (414) 345-7827

48. As part of the investigation into DAVIS' DTO, case agents reviewed call detail records from DAVIS' telephone call number 262-888-0716 between December 11, 2021 and January 28, 2022. DAVIS contacted GRAHAM's cellular telephone assigned call number (414) 840-9759 184 times. Further case agents observed DAVIS contacted telephone number (414) 345-7827 140 times between this time frame also.

49. Based on this information, case agents review a law enforcement databased and located (414) 345-7827 being a telephone number utilized by GRAHAM. Based on surveillance conducted on January 26, 2022 prior to the undercover controlled buy, case agents observed DAVIS and GRAHAM enter Educators Credit Union located at 6131 West Center Street, Milwaukee, WI. Case agents obtained a federal subpoena for records from Educator Credit Union regarding DAVIS and GRAHAM. Educator Credit Union had an account for GRAHAM in which GRAHAM listed his telephone number (414) 345-7827.

### b. DAVIS' Number (262) 888-3327

50.     On February 9, 2022, case agents obtained a federal search warrant authorizing electronic surveillance of DAVIS' cellphone of (262) 888-0716; however, when case agents served the warrant on the provided they were informed that (262) 888-0716 was terminated on February 7, 2022.

51.     Case agents worked to determine the new telephone number being used by DAVIS. Case agents review call detail records for DAVIS's DTO's prior drug customer phone (414) 840-9759 between February 7, 2022 and March 3, 2022, when DAVIS dropped his prior number, and identified phone number (262) 888-3327 having 90 contacts with DAVIS's DTO's prior drug customer phone.

52.     Case agents also reviewed call detail records between GRAHAM's number (414) 345-7827 and (262) 888-3327 and observed 42 contacts between February 12, 2022 and March 11, 2022. Case agents obtained call detail records for (262) 888-3327, which indicated there was no subscriber information associated with the number and had a service provider of Verizon Cellular, similar to DAVIS's previously disconnected number of (262) 888-0716.

53.     Based on the call detail records, case agents interviewed CS. On February 23, 2022, CS confirmed he/she has communicated with DAVIS and DAVIS was using telephone (262) 888-3327.

### c.   PINKARD's Number (414) 748-5568

54.     As part of the investigation into DAVIS's DTO, case agents reviewed call detail records to determine if PINKARD was using a telephone other than the drug customer line. Case agents reviewed call detail records of DAVIS's DTO prior drug customer phone of (414) 840-9759, which demonstrated 28 contacts to phone number (414) 748-5568 in the last 45 days.

55.     Case agents utilized a law enforcement database which indicated (414)748-5568 was a number associated with Juiquin PINKARD. Case agents review call detail records for (414)

748-5568, which indicated the service provider as AT&T. Further call detail records indicated the subscriber was Quan PINKARD at 5831 N. 62nd Street, Milwaukee, WI 53218. PINKARD has a listed address of 5831 N. 62nd Street, Milwaukee, WI 53218 with Wisconsin DOT.

### D. Additional Surveillance of DAVIS' DTO Members

56. During the investigation, case agents determined members of DAVIS's DTO rent out vehicles to conduct their drug operations. Based on my training and experience I know people involved in illegal activity related to trafficking illegal controlled substances will often use rental vehicles to deter and elude police detection. The individual operating the vehicle generally will not be associated with the rental agreement. This is done so the person conducting the illegal active can attempt to flee police if needed.

57. In January GRAHAM rented a Ford Fusion from Avis Rental. The Ford rental was used in the controlled heroin buy on January 27, 2022. GRAHAM was driving the vehicle during the operation with DAVIS as a passenger. During the investigation the Ford was parked at 4458 N. 67th Street, Milwaukee, WI overnight on several occasions when case agents checked the address. Based on the rental vehicle's location overnight and electronic surveillance, case agents believe 4458 N. 67th Street is the residence of DAVIS. Further case agents observed Davis operating the Ford during the month of January 2022.

58. On February 24, 2022 GRAHAM rented another vehicle from Avis Rental, a red Mazda 6. Case agents observed the mentioned Mazda parked on a regular basis at 4458 N. 67th Street. Case agents have observed DAVIS operating the vehicle.

59. During the month of March 2022 Case agents determined PINKARD was driving a new rental vehicle described as 2021 Hyundai sedan, Blue, MN registrations FXV585. The vehicle listed to Avis Rental. The vehicle was rented by Marquist Davis who listed his address at 5251 N. 48th Street, Milwaukee, WI. The address is believed to be affiliated with DAVIS' DTO

as controlled buys occurred in the area of the residence. Further case agents observed PINKARD parked in front of the residence on several occasions during the investigation in the month of March 2022.

60. On March 29, 2022 case agents conducted a garbage pull from the residence at 5251 N. 48th Street. Case agents located multiple sandwich baggies with the corners missing. Based on my training and experience the ripped plastic baggies are consistent with remains from corner cuts. More specially, drug traffickers commonly packet drugs into small plastic baggies to sell and then ripping the top of the plastic baggy while tying off the drug and packaging, discarding the unused portion of the baggie. Also located were identifiers on CVS prescription paperwork to the last name of PINKARD at the address.

61. Case agents observed PINKARD operating the 2021 Hyundai during the month of March 2022. While operating the vehicle PINKARD was observed parking in front of 4711 N. 89th Street, Milwaukee, WI. PINKARD was observed entering the front door and using a key to make entry. On March 29, 2022 case agents conducted a garbage pull at 4711 N. 89th Street. Located in the garbage were several sandwich baggies with the corners missing, similar to what case agents located at 5251 N. 48th Street. Also located was an Avis Budget rental agreement for the silver Volkswagen with Ohio HZT7153. The vehicle was rented by Marquist Davis. Further the vehicle was used during multiple controlled buys by PINKARD.

62. During the month of March 2022 Davis was operating a 2021 Madza 6, Red, IL registration CB70027. The vehicle is parked regularly at 4458 N. 67th Street which is DAVIS' residence. The vehicle is an Avis rental which was rented by GRAHAM at the beginning of the month.

63. During this investigation case agents observed GRAHAM using an ATM machine at Educator's Credit Union on multiple occasions. Present during some of these transactions with

GRAHAM was PINKARD or DAVIS. Based on the observation case agents subpoena Educator's Credit Union records for GRAHAM. GRAHAM held an account at Educator's Credit Union which listed his home address of 3057 Unit A N. 52nd Street, Milwaukee, WI and telephone number of (414) 345-7827. In review of the records case agents did not locate any payroll deposits into this account held by GRAHAM. Instead, case agents observed that the account is used for cash deposits that occur near in time to GRAHAM renting vehicles, withdrawals to car rental companies, and withdrawals at ATMs at Potawatomi Casino. Based on this information, case agents believed that DAVIS and/or PINKARD are providing GRAHAM with cash from drug proceeds. In return GRAHAM is depositing the cash and renting the vehicles for DAVIS and PINKARD. Examples are listed below.

64. Case agents reviewed the records and identified three cash transactions where GRAHAM deposited over $4,000.00 in cash.

65. On December 24, 20210 GRAHAM deposits $1,180.00 in cash. The deposit consisted of 59 $20 bills. GRAHAM was with DAVIS and DAVIS was the one driving.

66. On January 24, 2022 GRAHAM deposits $2100.00 in cash which consisted of 2 $10 bills, 79 $20 bills, and 5 $100 bills. GRAHAM was by himself for this deposit. On this same day, GRAHAM rents the Black Ford Fusion with Florida plates 88ABGR for $588.59 and has the rental from January 24, 2022 to January 31, 2022. This vehicle was driver by GRAHAM with DAVIS has his passenger during the undercover controlled drug transaction by on January 27, 2022.

67. On January 27, 2022 GRAHAM deposits $900.00 in cash. The deposit consisted of 4 $5 bills, 4 $10 bills, and 42 $20 bills. GRAHAM was driving a black ford fusion for this deposit and in the passenger seat was PINKARD. Case agents observed this deposit during surveillance on this day. On this same day, GRAHAM rents the Silver Honda Accord with

Illinois plates CU21390 and has the rental from January 27, 2022 to February 9, 2022 for $1199.55. This vehicle then used for the undercover controlled drug transaction in Racine, WI as counter surveillance by PINKARD.

68.     On February 28, 2022 GRAHAM deposits $1200.00 in cash. The deposit consisted of 60 $20 bills. GRAHAM was in the passenger seat and DAVIS was driving. On this same day GRAHAM rents the Red Mazda with Illinois plates CB70027 and has the rental from February 28, 2022 to March 31, 2022. There was no rental amount list for this rental agreement.

69.     During the month of March 2022 case agents conducted surveillance of DAVIS. During the surveillance it was found DAVIS spends time at Potawatomi Casino. Case agents learned DAVIS holds a player's card. Case agents review the records of DAVIS players card and found DAVIS has used around $120,000.00 on his players card for the year of 2022. Based on my training and experience, I know that members of DTO will use drug proceeds at casinos, in an attempt to make the fund appear legally obtained, as known as "laundering" the drug proceeds.

70.     On March 29, 2022, case agents were monitoring call detail records and court authorized electronic surveillance for Davis's cellular telephone number (262) 888-3327, Pinkard's cellular telephone number (414) 748-5568 and DAVIS' DTO drug customer telephone number **(414) 587-6004 (TARGET CELL PHONE)**. In the afternoon PINKARD contacted DAVIS. At this time PINKARD was at DAVIS' residence at 4458 N. 67th Street. After the phone contact DAVIS arrived at the residence about 10 minutes later. Both DAVIS and PINKARD entered the residence. After only a couple minutes PINKARD exited the residence with a plastic grocery type bag. PINKARD entered his rental vehicle and left the area.

71.     On April 9, 2022 case agents were monitoring call detail records and court authorized electronic surveillance of GRAHAM's cellular telephone number (414) 345-7827 and DAVIS' cellular telephone number (262) 888-3327. During this time GRAHAM makes contact

with DAVIS via phone. GRAHAM was at DAVIS residence and DAVIS was in Watertown, WI. After the contact GRAHAM left DAVIS resident and returned to what case agents believes his GRAHAM's residence at 3057a N. 52nd Street, Milwaukee, WI.

72.     Case agents reviewed call detail records of DAVIS cellular telephone (262) 888-3327, PINKARD's cellular telephone (414) 748-5568, GRAHAM's cellular telephone (414) 345-7827 and DAVIS's DTO drug customer phone **(414) 587-6004 (TARGET CELL PHONE)** during the time frame of March 28, 2022 and April 11, 2022.

73.     Between March 28, 2022 and April 11, 2022 DAVIS' cellular telephone (262) 888-3327 made contact with the drug customer phone **(414) 587-6004 (TARGET CELL PHONE)** 32 times, GRAHAM's phone (414) 345-7827 22 times and had zero contacts with PINKARD's phone (414) 748-5568.

74.     Between March 28, 2022 and April 11, 2022 PINKARD's phone (414) 748-5568 made contact with the drug customer phone **(414) 587-6004 (TARGET CELL PHONE)** 5 times. PINKARD's phone (414) 748-5568 had zero contacts with DAVIS' phone (262) 888-3327 or GRAHAM's phone (414) 345-7827 during this time frame. Based on this information it is believed Pinkard controls the dope on a normally regular basis.

75.     Between March 28, 2022 GRAHAM's phone (414) 345-7827 makes contact with Davis' phone (262)888-3327 22 times, but has zero contacts with PINKARD's phone 414) 748-5568 or the drug custom phone **(414) 587-6004 (TARGET CELL PHONE)**. Case agents believe it is possible that GRAHAM recently added another number to communicate with PINKARD and the drug customer phone as prior phone records show GRAHAM was having contact with PINKARD and the drug customer phone. At this point all four phones are currently active.

**E.  Prior Court Authorized Electronic Surveillance**

76.     On February 9, 2022, Honorable Judge Nancy Joseph authorized a warrant for electronic surveillance for DAVIS' prior cellular telephone assigned call number (262) 888-0716. Unfortunately, Verizon notified law enforcement that service to telephone call number (262) 888-0716 was terminated on February 7, 2022, so law enforcement did not execute any electronic surveillance of (262) 888-0716.

77.     On February 16, 2022, Honorable Judge Nancy Joseph authorized a warrant for electronic surveillance for DAVIS' DTO's drug customer cellular telephone assigned call number (414) 840-9759 and GRAHAM's cellular telephone assigned call number (414) 345-7827. These were served on the providers.

78.     On March 16, 2022, Honorable Judge William E. Duffin authorized a warrant for electronic surveillance for DAVIS' DTO's drug customer cellular telephone assigned call number **(414) 587-6004 (TARGET CELL PHONE),** DAVIS' telephone assigned call number (262) 888-3327, PINKARD's telephone assigned call number (414) 748-5568, and GRAHAM's telephone assigned call number (414) 345-7827, which were all served on the provider.

79.     Affiant has utilized the court-authorized electronic surveillance of the **TARGET CELL PHONE** and other members of DAVIS' DTO's cellular phones, as well as physical surveillance. The results thus far demonstrate the continual ongoing nature of DAVIS' DTO, as described in this affidavit.

80.     Case agents believe DAVIS, GRAHAM, and PINKARD are using the **TARGET CELL PHONE** to facilitate communications with known and unknown co-conspirators and sources of supply, and drug customers. Case agents further believe DAVIS, GRAHAM, and PINKARD haves made and will continue to make frequent visits to locations in which they store and distribute narcotics for the DTO. Case agents believe that the historical and prospective monitoring of the **TARGET CELL PHONE's** location will assist in identifying potential sources

of supply, distributors, and locations associated with the DTO. I believe the **TARGET CELL PHONE**, whose service provider is US Cellular ("Service Provider"), a wireless telephone service provider, continues to contain valuable information that could be used as evidence for the possible crimes of distribution and possession with intent to distribute controlled substances and conspiracy to distribute and possess with the intent to distribute controlled substances, violations of Title 21, United States Code, Sections 841 and 846.

## IV. TECHNICAL BACKGROUND

81.     Based on my training and experience, I know that Service Provider can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the **TARGET CELL PHONE**, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on Service Provider's network or with such other reference points as may be reasonably available.

### A. Cell-Site Data

82.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device

does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

83.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a historical and prospective basis about the **TARGET CELL PHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**B.  E-911 Phase II / GPS Location Data**

84.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

85.     As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural

areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

86.     Affiant also knows that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

87.     Based on Affiant's training and experience, Affiant knows that Service Provider also can collect per-call measurement data, which Service Provider also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

88.     Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **TARGET CELL PHONE** including by initiating a signal to determine the location of the **TARGET CELL PHONE** on the Service Provider's network or with such other reference points as may be reasonably available.

**C. Pen-Trap Data**

89.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## D.  Subscriber Information

90.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.

91.     In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **TARGET CELL PHONE**'s user or users, the locations of that user or users, the patterns of that user or users, and

may assist in the identification of other co-conspirators. A frequency analysis of the telephone communications between DAVIS, GRAHAM, PINKARD and others known and unknown individuals is material, in that it can establish whether the calls from the **TARGET CELL PHONE** are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the **TARGET CELL PHONE** can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether DAVIS, GRAHAM, PINKARD and others acted-in-concert, by establishing the nature and extent of their relationship, the existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

## V.    AUTHORIZATION REQUEST

92.    Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

93.    I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

94.    I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

95.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice till February 2, 2023, pursuant to the Omnibus signed by Honorable Judge Nancy Joseph on February 4, 2022. This investigation is expected to remain covert at least until then, so disclosing the warrant would alert targets or subjects about the existence of a federal investigation. Case agents will continue to request the same notification deadline for all warrants in this investigation, so that the notifications can be coordinated or extended as necessary. A single notification date will reduce the administrative burden on case agents and the Court, minimize the risks of disclosure, and promote judicial economy. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET CELL PHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1).

96.     As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

97.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize

execution of the warrant at any time of day or night, owing to the potential need to locate the

**TARGET CELL PHONE** outside of daytime hours.

**ATTACHMENT A**
**Property to Be Searched**
**Matter No. 2022R00039**

1.      Records and information associated with the cellular devices assigned call number

call number **(414) 587-6004**,  (referred to herein and in Attachment B as "the **TARGET CELL**

**PHONE**") whose listed subscribers are unknown, that is in the custody or control of US Cellular

(referred to herein and in Attachment B as the "Service Provider"), a wireless communications

service provider that is headquartered at 8410 W Bryn Mawr Ave, Chicago, IL 60631.

2.      **TARGET CELL PHONE**.

**I.      Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession,

custody, or control of the Service Provider, including any information that has been deleted

but is still available to the Service Provider or that has been preserved pursuant to a request

made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government

the following information pertaining to the Account listed in Attachment A:

- a. The following subscriber and historical information about the customers or subscribers associated with **TARGET CELL PHONE** for the time period from April 14, 2022 to present:

  - i.   Names (including subscriber names, user names, and screen names);

  - ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

  - iii. Local and long-distance telephone connection records;

  - iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

  - v.   Length of service (including start date) and types of service utilized;

  - vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

  - vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

  - viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **TARGET CELL PHONE** including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **TARGET CELL PHONE** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **TARGET CELL PHONE** will connect at the beginning and end of each communication.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **TARGET CELL PHONE**.

c. Information about the location of the **TARGET CELL PHONE** for a period of 30 days, during all times of day and night. "Information about the location of TCP-1" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government

shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

### III. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1) involving James A. DAVIS, LaJuan J. GRAHAM, Juiquin PINKARD and other known and unknown individuals since August 1, 2021.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.